UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

VANITA DAVIS,

                    Plaintiff,            Civil Action No.: 12-cv-13728
                                                Honorable Julian Abele Cook
         v.                         Magistrate Judge David R. Grand

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                    Defendant.
_____/

## <u>REPORT AND RECOMMENDATION</u><br><u>ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [10, 11]</u>

Plaintiff Vanita Davis brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.    RECOMMENDATION

For the reasons set forth below, the Court finds that the Administrative Law Judge ("ALJ") erred in failing to consider the opinions of a treating physician, which prevents this court from conduct meaningful review. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [11] be DENIED, Davis's motion [10] be GRANTED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be REVERSED AND REMANDED for further consideration consistent with this

Report and Recommendation.

## II.   REPORT

### A.   Procedural History

On September 4, 2007, Davis filed applications for DIB and SSI, alleging disability as of April 30, 2003. (Tr. 118-128). The claims were denied initially on December 19, 2007. (Tr. 64-75). Thereafter, Davis filed a timely request for an administrative hearing, which was held on February 4, 2010, before ALJ Mary Ann Poulose. (Tr. 30-63). Davis, represented by attorney Karl Bender, testified, as did vocational expert ("VE") Edward Pagella. (*Id.*). On April 7, 2010, the ALJ found Davis not disabled. (Tr. 14-29). On June 21, 2012, the Appeals Council denied review. (Tr. 1-6). Davis filed for judicial review of the final decision on August 22, 2012. [1].

### B.   Background

#### 1.   *Disability Reports*

In disability reports, Davis claimed that the conditions preventing her from working are nerve damage in her back and carpal tunnel syndrome in both hands. (Tr. 147). She reported wearing hand braces and being unable to grip or feel things with her hands. (*Id.*). She also reported being unable to lift more than ten pounds or stand for any length of time due back and leg pain. (*Id.*). She previously worked as a cashier, but her employment ended when her employer would not let her wear her hand braces at work and her conditions made it difficult to complete job duties, which included lifting heavy items, restocking, returning carts, prolonged standing, bending and stooping. (*Id.*; Tr. 162). She began braiding hair at home to supplement her income, but had to stop due to her conditions. (Tr. 147). Davis reported being treated for her conditions, and taking Advil for pain. (Tr. 150-51). At her interview, the interviewing representative noted that Davis "had braces on both hands," and her "fingers were curled up

2

during the interview and during times when [Davis] had to reach for various objects," however she "was capable of signing her name without any obvious problems other than hands were in braces and fingers curled." (Tr. 144).

Davis reported that she lives in a house with her family, including children and grandchildren. (Tr. 170-71). Her daily routine consists of waking the children, washing, dressing and feeding them and sending the older ones to school. (Tr. 170). She will then do laundry, shower, dress herself, do light housework with help from her brother (including dusting, dishes and laundry), cook lunch for the baby, change diapers, help with homework and get everyone ready for bed. (*Id.*; Tr. 172; 177). She also reported taking pain pills as part of her day. (Tr. 171, 177). Davis reported needing help with self-care including dressing (buttoning clothes), bathing (getting in and out of the tub), and hair care (washing and braiding). (*Id.*) She reported that she can no longer apply pressure or use her hands fully, preventing her from accomplishing tasks such as opening jars, lifting over ten pounds, holding utensils, and turning keys. (Tr. 171). She also has trouble sleeping through the night due to pain and throbbing (she reported needing to hold her hands above her head and sleep with them in braces). (*Id.*).

Davis can prepare quick meals daily, although her ability to stand and hold utensils makes it difficult. (Tr. 172). She cannot do any outside work or anything that requires heavy lifting, pushing, pulling, or twisting with her hands. (*Id.*) Davis reported going out daily, but not being able to drive due to an inability to hold the steering wheel. (Tr. 173). She is able to go out alone and shops for food and clothing approximately every two weeks and attends church. (*Id.*; Tr. 174) Her hobbies include reading, sewing, playing board games, watching television and bowling. (Tr. 174). However she can now only sew for repairs and cannot bowl any longer due to her conditions. (*Id.*) Davis reported that her conditions interfere with her ability to lift, squat,

3

bend, stand, reach, walk, kneel, climb stairs, complete tasks and use her hands.  (Tr. 175).  She can stand for 30 minutes at a time and walk about three blocks before needing to rest.  (*Id.*)

In an undated disability appeals report, Davis reported worsening of her conditions since January 10, 2008, including less range of motion, limited walking and standing, and muscle spasms and loss of feeling in her hands.  (Tr. 182).  She also reported being diagnosed with diabetes on February 2, 2008, and suffering complications from that condition, including impaired sight.  (*Id.*)  She reported being prescribed new medications, including cyclobenzaprine for muscle spasms (the reported side effect of which is blurred vision), gabapentin for pain (side effect is drowsiness), Metformin for diabetes (side effect is upset stomach), and Topamax for migraine headaches (side effect is drowsiness).  (Tr. 184).  She reported no longer being able to travel alone due to muscle spasms, loss of balance and blurred vision.  (Tr. 185).

In a subsequent function report, dated April 9, 2009, Davis mostly reiterated what she had previously reported, although she also reported that her conditions now interfere with her ability to hear, see, remember, and concentrate due to her medications.  (Tr. 195).  She also reported that she can now lift no more than five pounds, stand for ten minutes, and walk only a ½ a block before needing to rest, and that she now uses a cane.  (*Id.*; Tr. 196).  She sleeps no more than 30 minutes to an hour before waking, and sometimes does not sleep at all.  (Tr. 191).  She also reported that stress negatively affects her conditions.  (Tr. 196).  She does not drive due to seizures and medication and a loss of "full use" of her right side.  (Tr. 193).

In a third function report, dated June 3, 2009, Davis again reported consistent effects of her conditions, although she now only goes outside to go the doctor or to shop; though she knows she should not travel alone, she often does due to a lack of help.  (Tr. 201).  She reported being subject to blackouts due to migraine triggered seizures.  (*Id.*).  Davis reported now being

4

able to lift less than 10 pounds rather than only five.  (Tr. 203).  Davis explained that her conditions come on with no warning and that bright lights, sounds and smells cause her to become sick.  (Tr. 205).  She also reported (for the first time) that she suffers from fibromyalgia and that her jerky movements make others think she has been drinking rather than that she is ill. (*Id.*).

### 2.    *Plaintiff's Testimony*

At the hearing, Davis testified to suffering from migraine headaches, fibromyalgia, and Raynaud's Syndrome.  (Tr. 37-59).  She testified that she suffers from migraine headaches three to four times a week, and that they sometimes result in her losing complete vision and hearing. (Tr. 39; 54).  She does not have a driver's license as a result of this effect of her headaches.  (Tr. 37-38).  She attempts to prevent the headaches from getting to that point by lying in a dark quiet room for an hour or two.  (Tr. 52-54).  Even then, the pain remains at about an eight out of ten. (Tr. 57).  When her headaches are really bad, she will lose vision for approximately a day or so and she also may have a nose bleed.  (Tr. 38; 40).  The headaches are triggered by bright or flashing lights, loud noises and sweet smells, and she tries to avoid these triggers to prevent her headaches.  (Tr. 41-42).  She has been taking Topamax daily to prevent the headaches and Tramadol for the pain.  (Tr. 42-43).

Davis testified that she also suffers from fibromyalgia that has resulted in pain in her legs, arms, back, neck and shoulders, and in her right side giving out at times, which resulted in two falls in 2009.  (Tr. 45-46; 58)  She originally believed she had a stroke, but was informed by her doctors that the weakness was the result of fibromyalgia.  (Tr. 45-46).  She now walks with a cane for stability.  (Tr. 46).  She can stand approximately 15 minutes comfortably and has trouble sitting still for long periods of time.  (Tr. 50-51).  She also has problems going up and

down stairs and bending. (Tr. 51). She cannot lift more than a gallon of milk, and only with her left hand, and has trouble gripping items like a coffee cup. (Tr. 47-48). She can only reach above her head with her left arm, as her right arm only extends to chest height. (Tr. 48-49).

Davis also testified that she suffers from Raynaud's Syndrome, which affects circulation and feeling in her hands and feet. (Tr. 55-57). She and her family live with her mother during the winter because her body is less capable during that time and she needs additional help. (Tr. 47). Her hands have decreased pigmentation and her nails are not growing correctly, and she wears gloves and hand warmers to keep her hands warm and two pairs of thick socks for her feet. (Tr. 55-57). She has a difficult time holding anything due to a lack of feeling in her hands, and difficulty standing and walking. (Tr. 57-58). She began taking medication to improve her circulation, but at the time of the hearing it had not taken effect. (Tr. 57).

Davis testified that after leaving her job as a cashier due to her conditions, she braided hair approximately once a week for four hours to generate income. (Tr. 35-36). She stopped braiding hair in 2007 due to increasing problems with her hands. (Tr. 35). Prior to being a cashier she had also worked as a health aide and as a teller, but her headaches forced her to stop working in those positions. (Tr. 37-38). She testified that her children assist with her activities of daily living, including helping her in and out of the tub, and with cooking and cleaning. (Tr. 46-47). She testified to taking several different medications, including Topamax, Tramadol, nifedipine for Raynaud's, Amitriptyline HCL to help her sleep, and Metformin for diabetes. (Tr. 43-44). She used to take Cymbalta and Lyrica for fibromyalgia and depression but both caused adverse reactions and she stopped taking them. (*Id.*). Her doctors are looking for a different medicine for those conditions. (Tr. 44). She testified that her medications cause severe drowsiness and she does not go places by herself as a result. (Tr. 45).

6

3.      *Medical Evidence*

a.      *Treating Sources*

i.      *Primary Care Physicians*

In treatment notes from Davis's primary care physician, Dr. Sandy Abdelall, from May 2, 2002, Davis reported a history of asthma, a possible mini-stroke in 1998 resulting in slurred speech for two years, hyperglycemia and gestational diabetes.  (Tr. 289).  She reported having carpal tunnel surgery in approximately 2000.  (*Id.*).  She had a number of neurological complaints, including head tremors, blurred vision, upper arm pain and weakness, sensory difference in the right side of her face, loss of sensation and weakness in her hands, left foot cramps and constant headaches.  (Tr. 288).  She reported taking Aleve for her arm pain, and that her headaches were relieved with neck stretching.  (*Id.*).  Upon examination, Dr. Abdelall noted decreased sensation in the right side of Davis's face and weakness in her bilateral upper extremities, but grip strength of 5/5.  (*Id.*).  She also found ride-sided dysdiadochokinesia and slight head bobbing.  (*Id.*).  She ordered blood work and an MRI of Davis's brain, referred her to a neurologist and prescribed Econtrin.  (*Id.*).

At a May 9, 2002 follow-up appointment, Davis reported still having a headache that that had sent her to the emergency room four days prior,[1] and that the Darvocet she had been given there had provided no relief.  (Tr. 286).  She reported photo- and phono-phobia, blurred vision and a strange metallic taste in her mouth for the last three to four days.  (*Id.*).  She also reported right hand numbness secondary to pre-existing nerve damage.  (*Id.*).  Upon examination, Davis's cranial nerves were intact, but she had some slight head bobbing.  (*Id.*).  Dr. Abdelall diagnosed

---

[1] Davis entered the emergency room on May 5, 2002, for a severe headache.  (Tr. 320-21).  A CT scan of her brain was unremarkable.  (Tr. 318).  The doctor recommended a spinal tap which came back normal.  (Tr. 320).  He gave Davis IV fluids and morphine with some relief, and she was discharged with medications for an unrelated urinary tract infection.  (*Id.*).

migraines and prescribed Imitrex.  (*Id.*).  At a May 23, 2002 follow-up, Davis reported feeling as

though she was having an allergic reaction to the Imitrex, reporting anaphylactic-like symptoms.

(Tr. 283).  No allergic symptoms were noted on a physical exam, and Dr. Abdelall administered

a subcutaneous dose of Imitrex, which provided Davis some headache relief.  (Tr. 283-84).  She

wrote another prescription for Imitrex and ordered an MRI of Davis's brain.  (Tr. 284).  Blood

work performed that same day revealed low MCH and MCHC levels and a high SED rate and C-

reactive protein level.  (Tr. 309-310).  A June 24, 2002 MRI of Davis's brain was unremarkable.

(Tr. 316).

At a follow-up on July 18, 2002, Dr. Abdelall noted that Davis was under the care of a

neurologist for her headaches, and was seeking refills of medication.  (Tr. 281-82).  He noted

that her headaches were not controlled, "occurring everyday," "yet exam is normal."  (*Id.*).

Despite this, Dr. Abdelall noted that Davis "is still able to proceed with her daily activities and

go to work."  (Tr. 281).  She refilled her medications, including Topamax.  (*Id.*).  Notes from a

September 10, 2002 appointment revealed no new information regarding her relevant conditions.

(Tr. 278).  It did note that a recent EEG was normal.  (Tr. 279).  Notes from a February 18, 2003

appointment show her seizures were "well controlled" by Topamax, but that her headaches were

constant due to her inability to use nonsteroidal anti-inflammatory drugs, because of her allergy.

(Tr. 224).  In April of that year she was referred again to a neurologist.  (Tr. 223).

The next time Davis saw a primary care physician, according to the available records,

was March 21, 2006, where she complained of being unable to lose weight despite being in a

weight loss program, as well as fatigue and muscle aches.  (Tr. 221).  Dr. Nidal Hammoud

ordered blood work to determine a cause for her fatigue.  (*Id.*).  Blood work performed on May

19, 2006, revealed a high fasting glucose level.  (Tr. 231).  Blood work conducted on May 23,

2006, revealed high glucose and alkaline phosphate levels, and a low MCH level. (Tr. 229-30). At a June 13, 2006 appointment, an examination revealed positive lumbar lordosis and tenderness over the SI joint bilaterally, as well as decreased range of motion in Davis's lumbar spine. (Tr. 219). The attending doctor assessed lower back pain that "may be [secondary to] pelvic/sacral dysfunction after childbirth." (*Id.*). He recommended over-the-counter Tylenol for pain and a follow-up in two to three weeks. (*Id.*). A July 10, 2006 note shows that Davis had a discussion with her doctor, but the topic is illegible. (*Id.*). At her next appointment, on June 4, 2007, Davis was seen for a routine health checkup. (Tr. 218). She reported increased back pain. (Tr. 216). Despite the doctor's notation that a physical exam form was completed, the record contains no notes from this appointment. (Tr. 218).

Davis began treating with a new primary care physician, Dr. John Urbanczyk, on January 10, 2008, complaining of chronic lower back pain with radiculopathy to her right leg and numbness that had bothered her for two years. (Tr. 256; 266). Dr. Urbanczyk noted that despite the duration of this condition, no work up had been performed. (*Id.*). Upon exam, he found positive lumbar paraspinal tenderness and tissue abnormalities at L1-L4. (*Id.*). He also found restricted forward flexion and extension of the lumbar spine. (Tr. 256). He noted some decreased sensation to touch of the right leg and some tenderness over the calf muscle, but a straight leg raising test was negative. (*Id.*). Dr. Urbanczyk ordered an MRI of Davis's lumbar spine and an ultrasound of her right leg to rule out deep vein thrombosis. (*Id.*). He also referred her to physical therapy and to a dietician for her obesity. (*Id.*). He prescribed Neurontin and requested a follow-up in 2-4 weeks. (*Id.*). A January 17, 2008 ultrasound of Davis's right leg was negative for deep vein thrombosis. (Tr. 315). A January 25, 2008 MRI of her lumbar spine was negative for a herniated nucleus pulposus. (Tr. 314).

9

At a follow-up on January 29, 2008, Davis continued to report lower back and right leg pain with numbness, with no progression. (Tr. 264). She also reported wrist pain. (*Id.*). She reported a prior epidural injection with no significant relief. (*Id.*). Upon exam Dr. Urbanczyk noted lumbar paraspinal muscle tenderness and tissue abnormalities at L2-L5. (*Id.*). A straight leg raising test was negative and a sensory test was unremarkable. (*Id.*). Dr. Urbanczyk noted mild swelling of the hands bilaterally, but no tenderness. (*Id.*). A Tinel's test was positive. (*Id.*). He increased Davis's dose of Neurontin and began Flexeril. (*Id.*). He noted that Davis would continue physical therapy. (*Id.*). He also ordered an x-ray for the right wrist and hand and blood work to check for connective tissue disorder or rheumatoid arthritis. (*Id.*).

At a February 4, 2008 appointment, Davis complained of "long standing [sic] severe" bilateral carpal tunnel syndrome. (Tr. 263). Although she had surgery in 2000, she reported that her symptoms returned in 2003. Upon exam there was no atrophy of her hand muscles and her grip strength was 3-4/5. (*Id.*). Dr. Urbanczyk administered an injection of Kenalog in each wrist and recommended a follow-up injection if symptoms improved, and a hand surgery consultation if they did not. (Tr. 263). Blood work performed on the same date revealed a high SED rate and C-reactive protein level and a low MCH level. (Tr. 296). X-rays of Davis's right hand and wrist were negative. (Tr. 313). At follow-ups on February 14 and 21, 2008, Davis complained of allergic reactions to her medications with no clear resolution. (Tr. 261-62). At a March 3, 2008 appointment, Davis reported no improvement with the wrist injections and the presence of severe weakness and pain "all the time." (Tr. 259). Dr. Urbanczyk diagnosed severe carpal tunnel syndrome and referred Davis to a surgeon. (*Id.*).

At a March 17, 2008 appointment, Dr. Urbanczyk referred Davis to physical therapy for her back and wrist pain and referred her to a specialist for her back pain. (Tr. 258). Nerve

10

testing conducted on Davis's arms by the specialist was essentially normal.  (Tr. 384).  On exam, Davis had 4/5 grip strength and no atrophy.  (*Id.*).  A Tinel's sign was positive.  (*Id.*).  The doctor also noted "pain behavior and give way throughout the exam and muscle testing."  (*Id.*).  He concluded that her symptoms were not likely carpal tunnel syndrome, given the "diffuse symptoms in the hands and feet."  (*Id.*).

Blood work performed on April 12, 2008, revealed high glucose, hemoglobin and chloride levels, and low MCH and MCHC levels.  (Tr. 290-92).  It also revealed abnormal protein and bacterial levels.  (*Id.*).  An anti-nuclear AB test was negative.  (Tr. 294).  Blood work conducted on May 8, 2008, revealed high hemoglobin A1C and C-reactive protein levels and a high SED rate.  (Tr. 388).  An ophthalmology exam on the same day revealed visual fluctuations, likely secondary to blood sugar fluctuation.  (Tr. 378).

On May 12, 2008, Dr. Urbanczyk completed a general medical examination report and a physical capacities assessment.  (Tr. 367-369).  In his examination report, he noted positive lumbar muscle tenderness and reduced grip strength of 4/5, as well as obesity.  (Tr. 368).  He noted that x-rays of her hands and a lumbar MRI were normal, however.  (*Id.*).  He concluded that Davis suffered from a lumbar strain, diffuse myalgia and weakness in her upper extremities that resulted in limitations to her abilities.  (*Id.*).  He assessed her limiting conditions as "temporary," and that they were substantially reduced by treatment.  (*Id.*).  He noted that she was limited in her ability to kneel, reach, and stoop and that she could not lift more than 20 pounds.  (Tr. 368).  He concluded that she was not currently capable of employment and recommended that she be evaluated by a rheumatologist "regarding inflammatory muscle disorder."  (*Id.*).  In his capacities assessment, completed the same day, the doctor checked that he was uncertain whether Davis's conditions were permanent or temporary.  (Tr. 369).  He determined that she

could sit up to 8 hours a day, and stand and walk only one hour each. (*Id.*). She could lift up to ten pounds occasionally, but no more, and that she could climb stairs for one hour each. (*Id.*). She was restricted from working around moving machinery and unprotected heights. (*Id.*).

Blood work on June 9, 2008, revealed a high glycohemoglobin level. (Tr. 382). Blood work on June 30, 2008, revealed a normal RH factor and CCP Ab, and a negative ANA test, but a high C-reactive protein level. (Tr. 374). It also revealed a high hemoglobin level, lymph Auto level and SED rate. (Tr. 373). At a follow-up appointment on October 9, 2008, Davis was treated for diabetes only. (Tr. 341-42).

Davis was seen by Dr. Urbanczyk on June 4, 2009, for a well adult exam. (Tr. 434-36). Her reported pain intensity at the time was a 9 out of 10. (Tr. 434). An exam of her systems revealed nothing unusual. (*Id.*). Dr. Urbanczyk noted her reports of fibromyalgia and migraines and that she was being seen by a rheumatologist and a neurologist for these conditions. (Tr. 435-36). He recommended a Mediterranean diet and moderate exercise on a daily basis "as tolerated" for weight loss. (Tr. 436). Blood work on June 2, 2009, showed heightened RDW, Lymph Auto and SED rate levels. (Tr. 442). At a diabetes check on October 7, 2009, Davis presented with parasthesia of her hands and feet, but upon exam there was no neurological deficit noted. (Tr. 422-23). Dr. Urbanczyk noted hyperpigmented and vertical lines on Davis's fingernails and considered a possible referral to dermatology on the next visit. (Tr. 423). He also considered a possible diagnosis of Raynaud phenomenon and began Davis on nifedipine. (Tr. 424). Blood work performed that same day revealed heightened RDW, Glycohemoglobin and Chloride levels, a low BUN to Creatine ration and a low $CO_2$ level. (Tr. 426-27).

Davis returned to Dr. Urbanczyk on November 6, 2009, for a follow-up on her hands. (Tr. 447). She reported no improvement with the nifedipine, and that she has stiffness and

12

numbness in the winter.  (Tr. 448).  Upon exam, Dr. Urbanczyk noted tenderness in Davis's hands, wrists and fingers, and dark vertical lines and pits in her nail beds.  (*Id.*).  He referred her to a dermatologist.  (*Id.*).

On January 22, 2010, Dr. Urbanczyk completed a physical RFC questionnaire for Davis. (Tr. 456-59).  He noted treating her since June 2009 (although the Court notes his treatment records go back farther than that) and that her diagnoses included fibromyalgia, migraine and diabetes.  (Tr. 456).  His prognosis of her condition was fair.  (*Id.*).  He listed her symptoms as including multiple joint pains and back pains, hand and arm pains, muscle soreness diffuse, fatigue and weakness.  (*Id.*).  He listed her pain quality as aching and stiffness that occurs daily and was moderate to severe.  (*Id.*).  He identified the following objective signs that supported his opinion: multiple tender/trigger points along trapezius; and elbow, arm, neck, back and paraspinal muscle tenderness.  (*Id.*).  He noted that her fibromyalgia had been treated by multiple medications that caused side effects such as dizziness, nausea and drowsiness.  (*Id.*).  He found that her condition could be expected to last more than twelve months and that she had physical limitations as a result.  (Tr. 457).  Specifically, Dr. Urbanczyk found that Davis's symptoms would frequently interfere with the attention and concentration needed to perform simple work tasks, and thus he limited her to low stress jobs, noting that "some stress is tolerated without pain." (*Id.*).   However, he was unable to complete a physical RFC evaluation due to Davis's inability to pay for it.  (*Id.*).  Dr. Urbanczyk referred to a "PT Eval Attached," but no other records accompany his report.  (*Id.*).  He concluded that Davis "has migraine headaches frequently, and they are worse with noisy environment[s], bright lights or [a] stressful workplace." (Tr. 459).

13

*ii.    Dermatologist*

Davis was treated by a dermatologist on November 17, 2009. (Tr. 406; 454). She reported coldness and loss of feeling in her hands and fingers and blanching of her skin. (Tr. 454). After exam and questioning, the doctor diagnosed isolated Raynaud's phenomenon and ordered blood tests. (*Id.*). At a December 8, 2009 follow-up, the doctor referred Davis for additional testing. (Tr. 452). On January 11, 2010, blood tests came back within normal limits and the doctor discussed Davis protecting her hands and feet from cold and possibly moving to a warmer climate. (Tr. 451).

*iii.    Rheumatologist*

Davis was treated by rheumatologist Dr. Samir Yahia on August 11, 2008, complaining of severe and chronic pain and depression. (Tr. 495). She was assessed with positive trigger points, diagnosed with severe fibromyalgia and chronic depression and was prescribed Zoloft. (Tr. 496-98). At a follow-up on November 26, 2008, Davis reported persistent pain and stiffness. (Tr. 344). She had been taking Tramadol, Prednisone and Zoloft. (*Id.*). No examination of tender points was conducted at this visit. (Tr. 345). She was diagnosed with fibromyalgia and prescribed Lyrica, Zoloft and Tramadol. (Tr. 346-47). Davis was seen again on January 26, 2009, where she complained of persistent pain and functional impairment. (Tr. 484). Her fatigue was rated a 10 out of 10. (*Id.*). Positive trigger points were noted and her medications were continued. (Tr. 485-87). On March 30, 2009, Davis was given an injection for a trigger finger problem and her medications were continued. (Tr. 480). At an appointment on June 29, 2009, tender trigger points were noted and medications were managed. (Tr. 473-76). At a March 2, 2010 appointment, Davis reported hurting everywhere and being unable to get out of bed. (Tr. 470). She reported difficulty sleeping, tiredness and dizziness. (Tr. 469). Her

14

functional impairment was 4.7/10 and her global assessment was 8.5/10.  (*Id.*).  Her symptoms included fever, headaches, rash, hearing problems, shortness of breath, chest pain, heartburn, nausea, loss of balance, numbness, swelling, depression, memory problems, sleeping problems and fatigue of 7/10.  (*Id.*).  She had 14 trigger points on examination, and Dr. Yahia diagnosed chronic fibromyalgia with chronic fatigue syndrome.  (Tr. 469).

On February 2, 2010, Dr. Yahia completed a physical RFC questionnaire and a fibromyalgia RFC questionnaire for Davis.  (Tr. 461-68).  In the physical RFC he diagnosed her with fibromyalgia and gave her a fair prognosis.  (Tr. 461).  Her symptoms included pain, fatigue, dizziness and depression.  (*Id.*).  His clinical findings included noting that she had multiple trigger points (16 of 18).  (*Id.*).  He found that she had partially responded to Tramadol and arnitriptyline.  (*Id.*).  Her impairments were expected to last at least 12 months and were exacerbated by her depression and anxiety.  (Tr. 462).  He found that her symptoms would frequently interfere with her ability to work and that she was incapable of working at even low stress jobs.  (*Id.*).  He found Davis capable of walking two blocks before needing to rest, sitting for 20 minutes at a time and standing for 15, for a total of less than two hours a day.  (Tr. 462-63).  He also found that she must walk every 15 minutes for ten minutes at a time.  (*Id.*).  She did not need a job that allowed for a shifting of positions, but she would need to take unscheduled breaks every 45 minutes for 15 minutes at a time.  (Tr. 463).  She needed to use a cane to walk. (*Id.*).  Dr. Yahia further found that Davis could only rarely lift less than 10 pounds, could frequently look down, and occasionally turn her head, look up or hold a static position.  (*Id.*). She could occasionally twist, but never stoop, crouch, squat, or climb ladders or stairs.  (Tr. 464). She also had significant limitations with reaching, handling or fingering, being capable of grasping, fingering, or reaching only 25% of the time.  (*Id.*).  He also found she would be absent

from work more than four days a month.  (*Id.*).

In his fibromyalgia RFC, Dr. Yahia noted additional symptoms including non-restorative sleep, chronic fatigue, morning stiffness, subjective swelling, irritable bowel syndrome, frequent severe headaches, female urethral syndrome, vestibular dysfunction, numbness and tingling, Raynaud's phenomenon, dysmenorrhea, breathlessness, depression, carpal tunnel syndrome and chronic fatigue syndrome.  (Tr. 465).  He noted that Davis's pain was located in her bilateral shoulders, arms, hands, fingers, hips, legs, knees, ankles and feet.  (Tr. 466).  The pain was precipitated by changing weather, stress, fatigue, movement/overuse, static positions and cold.  (*Id.*).  When asked about functional limitations, Dr. Yahia referred to the answers given in his physical RFC questionnaire.  (Tr. 466-68).

### iv.   *Physical Therapy*

Davis underwent physical therapy from October 27 to December 17, 2008.  (Tr. 256-58).  Over the course of therapy, Davis's pain ranged from a 6-8/10.  (*Id.*).  She also reported falling twice at home during the course of therapy.  (*Id.*).  She often complained of pain and stiffness, sometimes of heaviness and leg cramps and freezing.  (*Id.*).  However, she always agreed to go forward with therapy despite her pain.  (*Id.*).

### v.   *Neurologist*

Davis was treated by neurologist Alicia Lumley on May 5, 2009, for her migraines.  (Tr. 416).  Davis reported having migraines since her teen years and that her headaches occurred daily with an intensity rating of 10/10.  (*Id.*).  Davis reported throbbing pain and sensitivity to light, noise and strong odors.  (*Id.*).  She also has "difficulty with some complete amaurosis during the headache."  (*Id.*).  She reported that her Topamax prescription had helped control her headaches and that she had not had one lately.  (*Id.*).  However, the intensity of her headaches

remains a 6/10.  (*Id.*).  She reported having been diagnosed with a stroke in 1990 when she suffered slurred speech and right side weakness.  (*Id.*).  Upon examination, Dr. Lumley noted no neurological deficits.  (*Id.*).  She recommended a brain MRI, an EEG, and increasing Davis's Topamax dose.  (Tr. 417).  Blood tests conducted on June 3 revealed high RDW, Lymphocyte and SED rate levels.  (Tr. 414-15).  An EEG conducted on June 6, 2009, was normal.  (Tr. 413).

At a June 9, 2009 follow-up appointment, Davis reported improvement with the increased Topamax dose, but that she still had headaches.  (Tr. 411).  An MRI taken on June 2, 2009, had shown "only Arnold-Chiari Malformation type I," and no strokes or lesions.  (*Id.*; Tr. 445). Upon examination, it was noted that Davis's gait was "abnormal" and that she used a cane.  (Tr. 411).  The doctor assessed that Davis's migraines were "probably associated to Arnold Chiari Malformation," and fibromyalgia.  (*Id.*).  Dr. Lumley again increased Davis's Topamax dose, recommended that she stop Lyrica and prescribed Savella for fibromyalgia.  (*Id.*).  She also recommended that Davis continue physical therapy.  (Tr. 412).  At a July 17, 2009 follow-up, Davis reported not taking the Savella because she developed an allergic reaction to it.  (Tr. 410). Dr. Lumley assessed her with controlled migraines (although she now associated them with an Arnold Chiari Malformation type II), and controlled fibromyalgia, and continued her Topamax dose.  (*Id.*).  At a December 4, 2009 follow-up, Davis reported that her migraines were no longer controlled despite the medication.  (Tr. 409).  Dr. Lumley assessed uncontrolled migraines associated with Arnold Chiari Malformation and controlled fibromyalgia.  (*Id.*).  She prescribed amitriptyline to control the pain from the fibromyalgia and the headaches.  (*Id.*).

### vi.    Psychiatrist

Davis was treated by a psychiatrist on an outpatient basis for depression beginning April 29, 2009.  (Tr. 507).  She was referred by her rheumatologist.  (*Id.*).  She reported crying, chronic

17

pain, high stress, medical issues, decreased sleep, memory, concentration and activity and migraines. (*Id.*). Upon exam she appeared cooperative and open with a depressed and anxious mood and affect. (*Id.*). Her short term memory appeared impaired, while her judgment and long term memory were within normal limits. (*Id.*). Her perceptions were clear, her thought process logical and she had some insight into her problems. (*Id.*). Her motivation was intermittent. (*Id.*). She was diagnosed with a mood disorder secondary to her general medical condition and issued a global assessment of functioning ("GAF") score of 35-40. (Tr. 509).

At an appointment on July 1, 2010, Davis was found to have calm motor activity, normal speech, and a dysphoric, tearful mood. (Tr. 505). She was cooperative, with good eye contact, but her affect was restricted. (*Id.*). Her thought content was organized and she had a good fund of knowledge. (*Id.*). She was able to think abstractly and had good insight and judgment. (*Id.*). She was diagnosed with a mood disorder due to fibromyalgia and assessed a GAF score of 50. (Tr. 506). The doctor prescribed Cymbalta and Ambien and recommended continuing therapy. (*Id.*). At an appointment on July 30, 2009, Davis noted improvement in her symptoms, including increased sleep and decreased crying episodes. (Tr. 502). The doctor decreased her Ambien. (*Id.*). Davis continued to report improved mood symptoms at appointments on August 27, 2009, and September 24, 2009, despite varying levels of physical pain, and her medications were managed. (Tr. 500-501).

### b.    *Consultative and Non-Examining Sources*

On November 20, 2007, Davis underwent a consultative physical examination by Dr. Cynthia Shelby-Lane. (Tr. 235-44). She reported a history of chronic back pain since 2001 or 2002, and a history of carpal tunnel syndrome, for which she underwent surgery in 2000 or 2001. (Tr. 236). She reported taking over the counter pain medication (Advil or Tylenol) for both

conditions.  (*Id.*).  She reported that her past medical history also included asthma, gestational diabetes, chronic headaches, and seizures (for which she took no medication).  (Tr. 237).  Davis's physical examination was essentially normal.  (Tr. 237-38).  She did not need ambulatory assistance and was able to get on and off the exam table without difficulty.  (Tr. 238).  Her gait and stance were normal, and she was able to tandem, heal and toe walk.  (*Id.*).  She could squat to 40% and bend to 80%.  (*Id.*).  Her grip strength was 4/5 bilaterally.  (*Id.*).  Her shoulder abduction was 0-150, flexion of her knees 0-150 and her straight leg raising was 0-50 while lying down and 0-90 while sitting.  (*Id.*).  She had no neurologic abnormalities.  (*Id.*).  She was diagnosed with a history of chronic back pain and carpal tunnel syndrome.  (*Id.*).  Dr. Shelby-Lane filled out a range of motion form for Davis which mirrored her examination results.  (Tr. 240-41).  She also filled out a current abilities form which showed Davis capable of performing all activities of daily living without limitation.  (Tr. 242-43).

On December 11, 2007, a residual functional capacity assessment was completed by Dr. Jack Kaufman, based on a review of Davis's records to date.  (Tr. 245-52).  Dr. Kaufman determined that Davis was capable of lifting 50 pounds occasionally and 25 pounds frequently, and able to stand or walk six hours in an eight-hour day and sit for the same amount of time.  (Tr. 246).  She had an unlimited ability to push and pull.  (*Id.*).  Her only additional limitation was a need to avoid moderate exposure to vibration.  (Tr. 246-49).  Dr. Kaufman noted that while Davis complained of lower back pain, there were no medical records referencing such a claim, and it was not evaluated by the consultative examiner, nor were radiographic reports provided.  (Tr. 246).  With regard to her hands, there was no evidence of examination of a Tinel's sign, and with regard to her weight, although her BMI was 42, there was no specific reference to limitations as a result.  (*Id.*).

19

4.      *Vocational Expert's Testimony*

VE Edward Pagella testified at the hearing that Davis's past work as a cashier was light and unskilled and her work as a patient support person was medium and unskilled. (Tr. 60). The ALJ asked the VE to assume "a person of claimant's age, education and work experience and skill set . . . limited to light work that has to avoid unprotected heights, moving machinery, vibrating tools." (*Id.*). She asked if such a person could perform Davis's past work. (*Id.*). The VE testified that she could perform the work of a cashier. (*Id.*). The ALJ then added a limitation of only occasional use of the bilateral upper extremities. (Tr. 61). The VE testified that such a person could no longer perform work as a cashier, but could perform the duties of an information clerk (110,000 positions in the national economy), usher, (78,000 positions) or hostess (220,000 positions). (Tr. 61-62). The VE testified that these occupations are unskilled in the light level of physical tolerance, and they are classified as light because they require an individual to be capable of standing six hours out of an eight hour day. (Tr. 61).

**C.      Framework for Disability Determinations**

Under the Act, DIB and SSI are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity,

benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.    The ALJ's Findings

Following the five-step sequential analysis, the ALJ found Davis not disabled.  At Step One she found that Davis had not engaged in substantial gainful activity since her alleged onset date. (Tr. 19).  At Step Two she determined that Davis suffered from the following impairments: "fibromyalgia, migraines, seizures, and Raynaud's disease."  (*Id.*).  She found that Davis's alleged nerve damage to her back and her carpal tunnel syndrome were not severe, however, because there was insufficient objective medical evidence to show that these conditions more than minimally impact Davis's ability to perform basic work activity.  (Tr. 19-20).  At Step

21

Three, the ALJ concluded that none of Davis's conditions, either alone or in combination with one another, met or medically equaled a listed impairment, specifically looking at Listings 11.02 (Epilepsy – Convulsive epilepsy) and 11.03 (Epilepsy – Nonconvulsive epilepsy).  (Tr. 20). Next, the ALJ assessed Davis's RFC, finding her capable of performing "light work . . .  except only occasional use of the upper extremity bilaterally, avoiding unprotected heights, moving machinery, and vibrating tools."  (*Id.*).  At Step Four, she determined that, based on Davis's RFC, she was not capable of performing any of her past work.  (Tr. 24).  However, at Step Five, the ALJ concluded that there were a significant number of other jobs in the national economy that Davis could perform, given her age, education, work experience and RFC.  (Tr. 24). Therefore, she was found not disabled.  (Tr. 25).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)

(internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

Davis argues that the ALJ erred in failing to find severe her carpal tunnel syndrome, in not issuing limitations that either account for, or correspond to, her objectively documented symptoms, and in failing to discuss the opinions of Dr. Urbanczyk and Dr. Shelby-Lane. For the

reasons that follow, the Court finds that the ALJ erred in failing to discuss the opinions of Dr. Urbanczyk, a treating physician.  It therefore will limit its discussion to that issue.

An ALJ must give a treating physician's opinion controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) *quoting* 20 C.F.R. § 404.1527(d)(2).  If an ALJ declines to give a treating physician's opinion controlling weight, she must then determine how much weight to give the opinion, "by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician."  *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) *citing Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(d)(2).  The ALJ must give good reasons, supported by substantial evidence in the record, for the ultimate weight given to a treating source opinion.  *Id.*, *citing Soc. Sec. Rul.* 96-2p, 1996 SSR LEXIS 9 at *12, 1996 WL 374188 at *5.  An ALJ is not required to give any special weight to a treating source's conclusion that a claimant is disabled, as this conclusion is reserved to the Commissioner alone, based on all the evidence of record.  20 C.F. R. § 404.1527(e)(1), (e)(3).

Davis argues that remand is required because the ALJ failed to mention, let alone analyze, the opinions of treating physician Dr. Urbanczyk, who issued two separate RFC assessments in 2008 and 2009.  (Tr. 367-69; 456-59).  Davis is correct that the ALJ's decision does not mention either of Dr. Urbanczyk's opinions – a critical oversight given his treating relationship with Davis and the impact that Dr. Urbanczyk's opinions may have on a proper evaluation of Davis' claim for benefits.

24

In his 2008 assessment, Dr. Urbanczyk found that Davis suffered from a lumbar strain, diffuse myalgia and weakness in her upper extremities, evidenced by positive lumbar muscle tenderness and reduced grip strength.  (Tr. 368).  These conditions may have either been temporary or permanent (his forms are not consistent on the subject) and they affected Davis's ability to kneel, reach, stoop, climb and lift more than 20 pounds.  (Tr. 368-69).  He also found that while Davis could sit for eight hours a day, she could only stand or walk one hour each.  (Tr. 369).  He further restricted her from working around moving machinery and unprotected heights. (*Id.*).

In his 2009 assessment, Dr. Urbanczyk listed Davis's diagnoses as fibromyalgia, migraines and diabetes, as evidenced by multiple tender/trigger points and paraspinal muscle tenderness, and which were expected to last more than 12 months.  (Tr. 456-57).  He noted medication side effects including dizziness, nausea and drowsiness.  (Tr. 456).  While he did not render a physical limitation assessment, he did conclude that Davis's conditions would frequently interfere with the attention and concentration necessary to perform simple work tasks, and he limited her to only low stress jobs, nothing that "some stress is tolerated without pain." (Tr. 457).  He also noted that Davis had "migraine headaches frequently, and they are worse with noisy environment[s], bright lights or [a] stressful workplace."  (Tr. 459).

The ALJ did not discuss either of Dr. Urbanczyk's opinions, let alone issue them any weight or explain her reasoning.  While Dr. Urbanczyk's 2008 assessment could potentially be dismissed on the basis of its inconsistencies regarding the temporary or permanent nature of Davis's conditions and the amount of weight she could lift, or on the effectiveness of her treatment at the time (*see* Tr. 368-69), the same cannot be said for his 2009 assessment.

In one portion of the ALJ's opinion, she specifically discounted Davis's subjective

testimony regarding the side effects of her medication due to a purported lack of corroboration from objective medical evidence, including treatment notes. (Tr. 23) ("Though the claimant has alleged various side effects from the use of medications, the medical records, such as office treatment notes, do not corroborate those allegations."). This finding is not supported by substantial evidence; Dr. Urbanczyk's 2009 opinion specifically lists various significant side effects Davis experiences as a result of her medications, which corroborates her testimony.[2] (Tr. 456). The ALJ did not account for many limitations Dr. Urbanczyk imposed, including (from the 2008 opinion) the reduced ability to kneel, stoop or climb and the ability to only stand or walk an hour each per day and (from the 2009 opinion) the limitation to low stress jobs, and his note that Davis's migraines were exacerbated by noises, bright lights and stress (which could be interpreted as a restriction from certain noise and light levels). (Tr. 368-69; 457-59).[3]

The Commissioner argues that any failure on the part of the ALJ to comply with the regulations regarding Dr. Urbanczyk's opinion is harmless error where the ALJ indirectly attacked the opinions using other objective medical evidence and where Davis concedes that Dr. Urbanczyk's opinion substantially mirrored that of Dr. Yahia, whose opinion was considered, and mostly rejected, by the ALJ. These arguments lack merit.

First, while it is true that an ALJ can substantially comply with the regulations by

---

[2] In addition, contrary to the ALJ's opinion, several treatment notes from various providers document Davis's complaints of side effects from her medications. (*See* Tr. 409-10 (neurologist documenting Davis's complaints of side effects from Savella, Cymbalta and Lyrica); Tr. 469 (rheumatologist documenting Davis's intolerance to Lyrica and Cymbalta); Tr. 502 (psychiatrist noting Davis's complaint of excessive sleepiness after taking Ambien).

[3] While some of Dr. Urbanczyk's limitations correspond to ones incorporated in the ALJ's RFC assessment (*e.g.*, the prohibitions against unprotected heights and moving machinery) (*see* Tr. 22; 369), there is no evidence that this is because the ALJ considered his opinion. Indeed, the ALJ explained that she issued those limitations in response to treatment notes of Davis's neurologist. (Tr. 22).

26

indirectly attacking a treating physician's opinion,[4] there is no evidence of that here, where the ALJ failed to address a majority of the limitations imposed by Dr. Urbanczyk, let alone attack those limitations indirectly with other objective medical evidence.  For example, the ALJ did not mention any limitations regarding noise or lights.  Perhaps more significantly, she did not mention a limitation to low stress jobs or a concentrational limitation.  In fact, the ALJ failed to assess Davis's ability to concentrate at all, despite Dr. Urbanczyk's opinion that Davis's limitations in that regard led him to impose the low-stress job requirement.  (Tr. 457).  Furthermore, part of the ALJ's decision rested not on mere inconsistencies between Davis's subjective allegations and objective medical evidence, but on a purported lack of corroboration for her subjective complaints that may have been ameliorated if the ALJ had considered Dr. Urbanczyk's opinions.  As noted above, the ALJ dismissed Davis's subjective allegations regarding the side effects of her medication for a lack of corroboration, not due to other inconsistent objective evidence.

The ALJ's failure to address Dr. Urbanczyk's opined limitations, either directly or indirectly, prevents this Court from conducting a meaningful review of the ALJ's decision, and prevents Davis from adequately understanding the disposition of her case.  *See Coldiron*, 391 Fed. Appx. at 440 (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).  Therefore, this is not a case where the ALJ could be found to have substantially complied with the regulations by indirectly attacking the treating physician's opinion.

---

[4] As the Sixth Circuit held in *Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 440 (6th Cir. 2010), "Violation of the [treating physician] rule constitutes harmless error if the ALJ has met the goals of the procedural requirement – to ensure adequacy of review and to permit the claimant to understand the disposition of his case – even though he failed to comply with the regulations' terms.  An ALJ may accomplish the goals of this procedural requirement by *indirectly* attacking the supportability of the treating physician's opinion or its consistency with other evidence in the record."

Second, contrary to the Commissioner's argument, the fact that Davis and the Commissioner both concede that Dr. Urbanczyk's opinions substantially corroborate Dr. Yahia's opinion does not mean that the ALJ would have similarly dismissed Dr. Urbanczyk's opinions had they been considered.  In fact, quite the opposite is true.  The ALJ rejected portions of Dr. Yahia's opinion, including limitations issued on Davis's ability to lift, stand, walk, stoop, crouch, climb and squat because it was supposedly "inconsistent with the . . . objective medical evidence." (Tr. 24).  Had the ALJ considered Dr. Yahia's opinion together with Dr. Urbanczyk's opinions, which were substantially consistent in the functional limitations issued to Davis (*see* Tr. 24; 367-69; 456-59), the ALJ may well have given greater weight to Dr. Yahia's conclusions. For these reasons, the Court cannot say that the ALJ's failure to consider Dr. Urbanczyk's 2008 and 2009 opinions is harmless error.

Because the Court finds that the ALJ erred in not complying with the regulations in her assessment of treating physician Dr. Urbanczyk's opinions, and because that error cannot be considered harmless, the Court recommends that this case be remanded to the ALJ for further consideration consistent with this Report and Recommendation.

## III.    CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Davis's Motion for Summary Judgment **[10]** be **GRANTED**, the Commissioner's Motion **[11]** be **DENIED** and this case be **REMANDED** for further consideration consistent with this Report and Recommendation.


Dated: July 15, 2013                          s/David R. Grand
Ann Arbor, Michigan                         DAVID R. GRAND
                                            United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.   *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).   The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.   *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).   Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 15, 2013.

s/William Barkholz for Felicia M. Moses
FELICIA M. MOSES
Case Manager

29